RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 15a0225p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

───────────────

WILLARD MCCARLEY,

        *Petitioner-Appellant,*

     *v.*

BENNIE KELLY, Warden,

        *Respondent-Appellee.*

No. 12-3825

───────────────

On Remand from the Supreme Court of the United States.
No. 5:09-cv-02012—Benita Y. Pearson, District Judge.

Decided and Filed:  September 10, 2015

Before:  DAUGHTREY, GIBBONS, and DONALD, Circuit Judges.

───────────────

## COUNSEL

**ON BRIEF:**  Melissa M. Prendergast, OHIO PUBLIC DEFENDER'S OFFICE, Columbus, Ohio, for Appellant.  Mary Anne Reese, OFFICE OF THE OHIO ATTORNEY GENERAL, Cincinnati, Ohio, for Appellee.

───────────────

## OPINION

───────────────

BERNICE BOUIE DONALD, Circuit Judge.  This is an appeal from the district court's denial of Petitioner Willard McCarley's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  McCarley argued in his petition that the Ohio Court of Appeals unreasonably applied clearly established Sixth Amendment law by allowing a child psychologist to read into evidence the testimonial hearsay statements of a three-and-a-half-year-old declarant, where the declarant was not subject to any prior cross-examination.  The district court held that although the Ohio state courts unreasonably applied the rule of *Crawford v. Washington*, 541 U.S. 36

1

(2004), the Sixth Amendment violation was harmless error under *Brecht v. Abrahamson*, 507 U.S. 619 (1993), because it could not have substantially influenced the jury's verdict. On July 10, 2014, applying de novo review, we reversed the district court's judgment and remanded with instructions to grant McCarley a conditional writ of habeas corpus. *McCarley v. Kelly*, 759 F.3d 535, 549-50 (6th Cir. 2014).

On June 29, 2015, the United States Supreme Court vacated our opinion and remanded the case to us for further consideration in light of *Davis v. Ayala*, 135 S. Ct. 2187 (2015). *Kelly v. McCarley*, 135 S. Ct. 2887 (2015). The import of *Davis* is that our prior application of de novo review was erroneous. *See* 135 S. Ct. at 2198-99 ("[A] prisoner who seeks federal habeas corpus relief must satisfy *Brecht*, and if the state court adjudicated his claim on the merits, the *Brecht* test subsumes the limitations imposed by AEDPA."). But even under the appropriate deferential standard of review, we conclude that the state court unreasonably applied clearly established federal law, and that the error was not harmless under *Brecht*. Accordingly, we **REVERSE** the judgment of the district court and **REMAND** the case with instructions to grant McCarley a conditional writ of habeas corpus.

I.

On direct appeal, the Ohio Court of Appeals described the factual background of McCarley's trials and convictions as follows:

> {¶ 2} Charlene Puffenbarger filed a paternity suit naming McCarley as the father of her two year old son in November of 1991. Charlene filed the suit to obtain child support from McCarley, who initially denied paternity. McCarley did not wish to pay Charlene child support as he was already paying child support to Kim Pennington, his former girlfriend and the mother of his six year old son. McCarley threatened Charlene to drop the suit and stated that he would kill her before paying her child support.

> {¶ 3} On January 20, 1992[,] at approximately 10:00 a.m., a neighbor came to Charlene's apartment and found her on the couch. Charlene had several scalp lacerations, defensive wounds on her hands, and a leather strap wrapped twice around her neck. The coroner later estimated that Charlene had died sometime between 12:30 and 1:30 a.m. Both of Charlene's two children were at home when her murder occurred.

> {¶ 4} When the police arrived at Charlene's apartment, her three year old son ("D.P.") repeatedly looked at the uniformed officers and stated: "It was him. He

hurt mommy." Four days later, he made related statements in the presence of Phyllis Puffenbarger, D.P.'s grandmother. D.P. picked up a toy telephone and said things such as:

> "I am going to get the belt. A policeman. Go kick that window. Phone. Get the stick. I am going to shoot you. *** A policeman. My mom seen the policeman. *** What you do that to my mom. *** Policeman hit my mommy. Put tape on her."

Phyllis testified that D.P. had tears in his eyes and was looking at a picture of his mother when he made the statements. As a result of this incident, Phyllis contacted the police and took D.P. to a child psychologist at their suggestion. Dr. Dawn Lord was able to elicit several similar statements from D.P. during her sessions with him.

{¶ 5} On December 19, 1995, police officers made a surprise visit to McCarley's home on an unrelated matter. While speaking with McCarley in his garage, police officer Dennis Balogh saw a deputy sheriff's jacket and sheriff's cap strewn across a moving dolly. Officer Balogh remembered D.P.'s statements from years before and confiscated the jacket and cap as contraband.

{¶ 6} On May 21, 2004, a grand jury indicted McCarley on one count of aggravated murder, a special felony embodied in R.C. 2903.01(A). The jury ultimately found McCarley guilty, but an error during trial caused this Court to reverse the jury's verdict on appeal and remand the case. McCarley's second trial commenced on January 16, 2007. On January 25, 2007, the jury found McCarley guilty of aggravated murder. He was sentenced to life imprisonment with the possibility of parole in twenty years.

McCarley alleges that the admission of the testimony of Dr. Lord, the child psychologist, violated his Sixth Amendment right to confront the witnesses against him. Dr. Lord read to the jury, over counsel's contemporaneous objection, three letters she wrote to Lieutenant John Karabatsos ("Lt. Karabatsos") detailing her therapy sessions with the murder victim's minor son, D.P. The first letter to Lt. Karabatsos, prepared by Dr. Lord on January 30, 1992, stated:

> Thank you for referring [D.P.] to me. On January 30th, 1992, I had the opportunity to meet with [D.P.] for a diagnostic interview . . . .

> At that time he presented himself as a talented boy with many strengths. However, signs of anxiety and depression were noted. Also, some mild developmental delays were evidenced. It is important to realize that [D.P.] has experienced a number of recent psychosocial stressors. These included the following: Change in residency, death of his mother, and alleged witnessing of his mother's death. On the Parent Rating Scale of the behavior rating profile, [D.P.'s] maternal grandmother indicated that [D.P.] is shy, clings to parents, and is overly sensitive to teasing. It is important to realize that the maternal

grandparents appear to be very concerned about [D.P.] and his behavior. Also, they were in the process of grieving the loss of their daughter.

During the clinical interview, [D.P.] initially appeared fearful and guarded. When discussing this area, he reported that the alleged murderer of his mother threatened him with violence. He stated that the man told him he would kill him if he told about the homicide. This area was discussed with [D.P.] as well as safety issues were presented. Then [D.P.] became very verbal and open concerning his mother's death. It is imperative to realize that [D.P.] reported that he had witnessed the death -- I am sorry. When discussing this area, he said two guys, referring to two men, were in the house at mom's. When asked further about this, he stated these men had been there before and that the one man had a gun. When asked further about the situation, [D.P.] reported that the two men were white men and that the one man wore clothes that resembled a uniform. He stated that the one man began to become verbally assaultive with his mother and that an argument broke out. He said they are arguing, they were yelling, arguing, loud, louder, hit her. I am done. [D.P.] indicated that not only did verbal abuse occur, but that the man allegedly began to hit and beat his mother. He reported that this was one of his mother's boyfriends. He states that the man's name was Tim and that the man had been at the home two or three times previously. He was not able to provide the last name for this man.

During the consultation with the maternal grandfather, he stated that the mother did know a man by the name of Tim Greene who had worked on her car. The maternal grandmother stated that her daughter had dated a man by the name of Tim before dating Willard, the alleged father of [D.P.'s] sibling. It is important to realize that there are limitations to the clinical interview and the testing process due to [D.P.'s] young age. However, it is felt that he did witness his mother's death and the alleged crime. Without question, this has had an adverse impact on [D.P.], and he is very confused and fearful concerning the loss of his mother. [D.P.] does need individual psychotherapy, and his maternal grandmother -- grandparents, excuse me, need parent counseling in order to help them deal with the recent loss. Also, [D.P.] does need a dental examination and possible dental care.

His next appointment is scheduled for February 6th, 1992. If you need any further information or if I can ever be of any help to you, please do not hesitate to contact me. Thank you for your time and consideration in this matter.

The second letter, prepared by Dr. Lord on May 14, 1992, stated:

It is always a pleasure to work with you. I greatly appreciated the opportunity to see [D.P.] and his young brother . . . . [D.P.] has been seen at my office on four different occasions. At each time, he was very consistent in the details surrounding his mother's death. He reports that two men came to his mother's home and that both were Caucasian. He felt that both of the men were dressed in some form of uniform. He consistently stated that the uniforms were black. Also,

he indicated that one man had a gun. He reported that his mother knew the men and let them into the home without a struggle. He stated that the two men and his mother had been talking for quite some time, about the length of a TV program such as Sesame Street. Then he reported that the one -- that one of the men engaged in an argument with his mother. Allegedly, the argument escalated until the mother was attacked. [D.P.] felt that she had been attacked in the bedroom area. However, [D.P.] slept in the living room, which he could have confused as being the bedroom.

When presented with six different photographs, [D.P.] consistently picked a suspect, reporting it was that guy who hit his mother. The different pictures of this man which he has picked and identified as the alleged murderer were reportedly pictures of the alleged father of his brother. Also, he did identify two suspects as being possibly the man's friend that came to this home. It is important to realize that [D.P.] indicated that the murderer was accompanied by the -- by a friend, and the relationship these two men had were very friendly and close. Finally, [D.P.] reported that the alleged murderer went into the mother's closet and got something. He was unable to identify what kind of object was used in the attack of his mother. Due to [D.P.'s] young age, the time which has elapsed between the death of his mother, and the various interviews and the inherent difficulties in evaluating young children, it is not possible to definitively state who murdered [D.P.'s] mother. Rather, it is possible to take [D.P.'s] impressions of the situation and use them in order to obtain further information.

If you need any further information or if I can ever be of any help to you, please do not hesitate to contact me. Thank you for your time and consideration in this matter.

The third and final letter, prepared by Dr. Lord on June 6, 1992, stated:

It is always a pleasure to work with you. On June 6th, 1992, I again met with [D.P.] for an interview and consulted with his maternal grandmother. During the interview [D.P.] provided additional information. He reported that one of the two men hit his mother with a gun. He stated that the man hit his mother on the top and back side of her head. Again, he said that he watched his mother's murderer -- or murder, excuse me. He indicated that he was helping hi[s] mom and he was trying to get her out of the apartment during the time of the attack. Also, he added that one man went to his mother's closet, got a belt, and hurt his mother with it. Finally, he reported that the two men argued once his mother was dead.

If you need any further information or if I can ever be of any help to you, please do not hesitate to contact me.

At trial, Lt. Karabatsos explained why D.P. went to see Dr. Lord in the first place. On direct examination, after the lieutenant stated that police were initially unable to get any information about the murder from D.P., the prosecutor asked Lt. Karabatsos: "So what did you

do about that in order to have [D.P.] open up or be able to talk about anything he might have heard or seen?"  Lt. Karabatsos responded:

> When we -- when we originally talked to him, we determined that I was -- myself or Officer Breiding, neither one, were going to be able to extract any information from him, and we determined it was necessary to bring somebody who was a child psychologist, possibly, or somebody who was a child therapist in to speak with him, see if they could extract any information from him that he remembered from that evening.  And, of course, we believed that over the course of time he would need some assistance anyhow.

Then, on cross-examination, defense counsel asked Lt. Karabatsos why he sought outside assistance in communicating with D.P.:  "[Y]ou called Child Guidance because you wanted to find someone who could perhaps extract information from the child in the appropriate way and help the investigation?"  Lt. Karabatsos confirmed:  "That is -- that is all -- that is my main reason. . . .  Yes, our main concern was to try to get the information, but that was not the only thing that crossed our mind at the time."

Lt. Karabatsos also testified on cross-examination about his relationship and communications with Dr. Lord.  The lieutenant stated that he "would have asked Dr. Lord that anything that [D.P.] would have said during the course of the counsel, during the course of her interviews with him, that she make me aware of that so that I could use it in my investigation."  In response to a follow-up question, Lt. Karabatsos answered that he absolutely planned to use any information provided by Dr. Lord in his investigation to assist him with identifying the persons responsible for the murder.

The State argues that, even without Dr. Lord's testimony, sufficient evidence supported the verdict such that any Sixth Amendment violation was harmless error.  This evidence includes inconclusive DNA evidence on the murder weapon and other items from the victim's home and the testimony summarized in the following paragraphs.

Phyllis Puffenbarger, the victim's mother and D.P.'s maternal grandmother, testified to statements, admitted at both trials as an excited utterance, that D.P. made approximately four days after his mother's murder.  D.P. began speaking very quickly into a toy telephone and looking at a picture of his deceased mother.  Phyllis transcribed what D.P. said, and she read two sets of her notes to the jury at trial.  The first of those notes stated:

I am going to get the belt. A policeman. Go kick that window. Phone. Get the stick. I am going to shoot you. Kick the window. Bathroom. Are you out of here. Don't have no phone. A policeman. My mom seen the policeman. Gun. Threw in garbage. Sleeping on couch. I am going to crack you. Kick the window. Not getting out of here. Bob. I am not going to your house. Corner. Call Paw Paw. Get your radio. Go to sleep. Don't shoot. Paw Paw got the paper. Policeman did it, not the guy. Lights on. Big light. No telephones. You hear me. Policeman got buttons. What do you come to my house for. What you do that to my mom. You break window. Bob. Policeman hit mommy. Put tape on her. Put nuts in her mouth. Bad boy.

And he motions towards his neck. Picked up her picture and pretend talking on phone.

Belt hitting. Not belt but with a gun. I will break your foot. Pillow. Head. [Brother] and me. I don't want to shoot. Do you want to go to bed. Policeman got out of my house. We can't get the policeman out of here.

The second note stated:

The guy laughed and sticking tongue. Mom stick tongue and spit. Clap hands. Get off that bed. Shirt was ripping. Nothing was cold. Smacked hands together. The bike and pointed to [brother]. Mommy's shirt was dirty. Light on. Crack. Scary. Gun. Kicking the window with feet. Was up in bed. No. She walked up and see this gun. Police was open his mouth talking. Shoot somebody. She write on herself. She got a phone. She breaked it. That car will stay here. She bumped her head. Took his hand and smacked his face. She was jumping on bed. You see that belt. Gun don't work. [Brother] was walking on floor. Greg and Trey knocking on door and Mary. A while to get in door. Get in van. He opened the door. Key. He put it down on table. Better turn the truck on. Pillow. You better wait a minute. Turn truck on. Put pop in there. Police that guy. Pulling on bed and chair. Well, come in the house. Police have hat like that ball cap. Put pillow on mommy. Kick somebody. Set that belt. Crack somebody. Police lights on and off. Mommy jumping on bed.

Officer Eric Breiding testified concerning D.P.'s reaction to seeing police officers at the scene immediately following his mother's murder. According to Breiding: "When [D.P.] first saw me, the only thing he said, 'It was him. He hurt mommy.' And every uniformed officer he saw that day, he made the same statement over and over and over again."

Deputy Dennis Balogh testified regarding events that took place on December 19, 1995, well after Charlene Puffenbarger's 1992 homicide. Balogh went to McCarley's home on an unrelated matter and had a face-to-face encounter with McCarley in his garage. Balogh testified that, during this encounter, he observed "a deputy sheriff's jacket and a deputy sheriff's ball cap"

in the garage. Balogh confiscated those items as contraband because "Mr. McCarley was not related to any law enforcement agency," and testified that he understood at that time "the relationship of that jacket and hat to" Charlene Puffenbarger's murder.

II.

A.

When a district court denies a habeas petition, this Court reviews the lower court's legal conclusions de novo and its findings of fact for clear error. *Broom v. Mitchell*, 441 F.3d 392, 398 (6th Cir. 2006). The relitigation bar of the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254(d), applies to "any claim . . . adjudicated on the merits in State court proceedings." In our previous opinion, we determined that the Ohio Court of Appeals' harmless-error analysis did not constitute an adjudication on the merits for the purposes of § 2254(d)'s relitigation bar. *McCarley*, 759 F.3d at 543-44. Specifically, we cited the Ninth Circuit's opinion in *Ayala v. Wong*, 730 F.3d 831 (9th Cir. 2013), for the proposition that a state court's denial of relief based only on harmless-error analysis does not constitute an adjudication of a constitutional claim on the merits—thereby permitting de novo review, rather than review under the deferential AEDPA standard. *Id.* at 543 (quoting *Ayala*, 730 F.3d at 843). The Supreme Court explicitly rejected that proposition in *Davis*, holding that a state court's determination that a constitutional error was harmless "undoubtedly constitutes an adjudication . . . 'on the merits'" for purposes of § 2254(d). 135 S. Ct. at 2198 (citing *Mitchell v. Esparza*, 540 U.S. 12, 17-18 (2003) (per curiam)); *see also McCarley*, 759 F.3d at 550 (Daughtrey, J., concurring) ("The determination of whether any constitutional error is harmless or prejudicial . . . is part and parcel of a merits adjudication of the issue."). Accordingly, the deferential AEDPA standard applies to McCarley's petition and we may grant habeas relief only if the Ohio court's adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state-court adjudication is "contrary to" federal law if it reaches a conclusion of law opposite to that reached by the Supreme Court, or if the state court decides a case with materially indistinguishable facts differently than the Supreme Court. *Goodell v. Williams*, 643 F.3d 490, 495 (6th Cir. 2011) (citing *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)). "Clearly established Federal law" refers to Supreme Court holdings at the time of the state court's decision. *Williams*, 529 U.S. at 412. We may not employ circuit precedent "to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that [the Supreme Court] has not announced." *Marshall v. Rodgers*, 133 S. Ct. 1446, 1450 (2013) (per curiam).

Under § 2254(d)(1)'s "unreasonable application" clause, a federal court may grant habeas relief if the state court identified the correct legal principle but then applied it to the facts of the petitioner's case in an objectively unreasonable way. *Goodell*, 643 F.3d at 495. The Supreme Court has stated that, to constitute an unreasonable application, "the state court's ruling . . . [must be] so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). In sum, "[i]f this standard is difficult to meet, that is because it was meant to be. . . . [H]abeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Id.* at 102-03 (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring)).

B.

Because the Ohio Supreme Court denied leave to appeal, the Ohio Court of Appeals issued the last reasoned opinion addressing McCarley's Sixth Amendment claim:

> {¶ 23} McCarley argues that the trial court violated his right to confront the witnesses against him by allowing Dr. Lord to testify as to the statements that D.P. made during therapy. Specifically, McCarley argues that: (1) D.P.'s statements were testimonial because D.P. went to see Dr. Lord at the request of the police, and (2) there was no opportunity to cross-examine D.P. at trial because he could not remember the statements that he had made as a three year old. McCarley claims that he suffered material prejudice as a result of Dr. Lord's testimony. We disagree.

> {¶ 24} Initially, we note that we have doubt as to the validity of McCarley's argument that D.P.'s statements to Dr. Lord during therapy were testimonial in nature. See *Crawford v. Washington* (2004), 541 U.S. 36, 68-69 (finding that

only testimonial statements are subject to the rigors of the confrontation clause); see, also, *State v. Siler*, 116 Ohio St.3d 39, 2007-Ohio-5637 (holding that a three year old child's statements to police were testimonial because the primary purpose of the questioning was to establish past events for later prosecution). Even assuming it was error to allow Dr. Lord to testify, however, we find the purported error to be harmless. See Crim.R. 52(A); *State v. Cutlip*, 9th Dist. No. 03CA0118-M, 2004-Ohio-2120, at ¶ 17. On harmless error analysis, we "inquire 'whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction.'" Id., quoting *Madrigal*, 87 Ohio St.3d at 388, citing *Chapman v. California* (1967), 386 U.S. 18, 23.

We must determine whether the Ohio court's reasoning was objectively unreasonable in light of the Supreme Court's decisions interpreting the Sixth Amendment's Confrontation Clause. The "starting point" for a § 2254 case "is to identify the 'clearly established Federal law, as determined by the Supreme Court of the United States' that governs the habeas petitioner's claims." *Marshall*, 133 S. Ct. at 1449 (citing *Williams*, 529 U.S. at 412).

The Sixth Amendment provides, in pertinent part, that: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." U.S. Const. amend. VI. Incorporated through the Fourteenth Amendment, the Confrontation Clause, a "bedrock procedural guarantee," applies with equal force to criminal prosecutions by the States. *Crawford*, 541 U.S. at 42; *see also Pointer v. Texas*, 380 U.S. 400, 406 (1965).

The Supreme Court's decision in *Crawford v. Washington* initiated a sea change in Confrontation Clause jurisprudence. 541 U.S. at 68. After canvassing the English common law and practices of the States shortly after the Revolution, the *Crawford* Court arrived at an unequivocal conclusion as to what the Confrontation Clause requires with regard to testimonial evidence: "Where testimonial evidence is at issue, . . . the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." *Id.* The *Crawford* Court unfortunately "le[ft] for another day any effort to spell out a comprehensive definition of 'testimonial'" beyond a list of examples including police interrogations and prior testimony at a preliminary hearing, before a grand jury, or at a previous trial. *Id.* Justice Scalia's Opinion for the Court did, however, refer to dictionary definitions of "witnesses" and "testimony" for guidance in interpreting the language of the Confrontation Clause itself. *Id.* at 51. Witnesses are "those who bear testimony. Testimony, in turn, is typically a solemn

declaration or affirmation made for the purpose of establishing or proving some fact." *Id.* (quoting 2 N. Webster, An American Dictionary of the English Language (1828)) (internal quotation marks and alterations omitted).

The Supreme Court handed down only one opinion further refining the scope of "testimonial" evidence between its decision in *Crawford* and the Ohio Court of Appeals' rejection of McCarley's direct appeal on February 13, 2008: *Davis v. Washington*, 547 U.S. 813 (2006). The *Davis* Court, in a consolidated appeal, confronted two sets of statements made to police. *Id.* at 817-20.[1] In *Davis*, Michelle McCottry made the statements at issue to a 911 operator while reporting an ongoing domestic disturbance. *Id.* at 817-18. In the companion case, *Hammon v. Indiana*, Amy Hammon completed an affidavit containing the statements at issue after answering questions from a police officer who responded to a reported domestic incident at her home. *Id.* at 819-20.

The *Davis* Court provided the following guidance for distinguishing between testimonial and nontestimonial statements in response to police interrogation:

> Without attempting to produce an exhaustive classification of all conceivable statements—or even all conceivable statements in response to police interrogation—as either testimonial or nontestimonial, it suffices to decide the present cases to hold as follows: Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. *They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.*

*Id.* at 822 (emphasis added) (footnote omitted). The Court went on to clarify that the Confrontation Clause applies to informal, as well as formal, prior testimony. *Id.* at 826 ("In any event, we do not think it conceivable that the protections of the Confrontation Clause can readily be evaded by having a note-taking policeman *recite* the unsworn hearsay testimony of the declarant, instead of having the declarant sign a deposition."). The fruits of an interrogation,

---

[1]In *Davis*, the statements at issue were actually made to a 911 operator, but the Supreme Court considered the acts of 911 operators "to be acts of the police." 547 U.S. at 823 n.2. This holding made it unnecessary for the Court explicitly to "consider whether and when statements made to someone other than law enforcement personnel are 'testimonial.'" *Id.*

"whether reduced to a writing signed by the declarant or embedded in the memory (and perhaps notes) of the interrogating officer, [are] testimonial." *Id.* Applying these principles, the *Davis* Court held that Michelle McCottry's statements to the 911 operator were not testimonial because "the circumstances of McCottry's interrogation objectively indicate its primary purpose was to enable police assistance to meet an ongoing emergency," and then reached the opposite conclusion regarding the statements in Amy Hammon's affidavit because it "was part of an investigation into possibly criminal past conduct." *Id.* at 828-29.

*Davis* articulated four reasons why McCottry's statements were not testimonial evidence. *Id.* at 827. First, "McCottry was speaking about events *as they were actually happening*, rather than describing past events." *Id.* (quoting *Lilly v. Virginia*, 527 U.S. 116, 137 (1999) (plurality opinion)) (internal quotation marks and alterations omitted). Second, "any reasonable listener would recognize that McCottry . . . was facing an ongoing emergency." *Id.* Third, viewing the 911 call objectively, the Court concluded that the nature of the questions asked was such that the answers given "were necessary to be able to *resolve* the present emergency, rather than simply to learn . . . what had happened in the past." *Id.* Finally, the Court addressed the different levels of formality between McCottry's 911 call and the statements held to be testimonial in *Crawford*. *Id.* McCottry's frantic telephone call from an unsafe environment stood in stark contrast to Crawford's calm response to questions posed by police in the safety of the station house. *Id.* Accordingly, McCottry was not bearing witness or testifying because "[n]o 'witness' goes into court to proclaim an emergency and seek help." *Id.* at 828.

Turning to Hammon's affidavit, the *Davis* Court found it simple to classify those statements as testimonial. *Id.* at 829. There was no emergency in progress at the time of the interrogation, and the officer who questioned Hammon "was not seeking to determine . . . 'what is happening,' but rather 'what happened.'" *Id.* at 830. Another key factor in the Court's analysis was that "the primary, if not indeed the sole, purpose of the interrogation was to investigate a possible crime." *Id.* Accordingly, the *Davis* Court held that the statements in Hammon's affidavit were testimonial and their introduction likely violated the Confrontation Clause. *Id.* at 834.

III.

Applying the "rigorous standard" set forth in § 2254(d), *Desai v. Booker*, 732 F.3d 628, 630 (6th Cir. 2013), we must first decide whether the district court correctly concluded that the Ohio Court of Appeals unreasonably applied *Crawford* in its opinion denying McCarley's direct appeal. The Ohio court began its analysis by stating: "[W]e have doubt as to the validity of McCarley's argument that D.P.'s statements to Dr. Lord during therapy were testimonial in nature." This Court does not share those doubts.

The facts of the instant appeal are analogous to the facts in *Davis*. Lt. Karabatsos testified that he sought out Dr. Lord to speak with D.P. because "we determined it was necessary to bring somebody who was a child psychologist, possibly, or somebody who was a child therapist in to speak with him, see if they could extract any information from him that he remembered from that evening." The lieutenant also testified that he asked Dr. Lord to "make [him] aware" of anything D.P. said about the murder "so that [he] could use it in [his] investigation." Because Dr. Lord was questioning D.P. about the night of his mother's murder and reporting everything D.P. said that might be relevant to the investigation back to Lt. Karabatsos, Dr. Lord was acting more as a police interrogator than a child psychologist engaged in private counseling. *Cf. Brewer v. Williams*, 430 U.S. 387, 399 (1977) (holding a police officer violated Williams' Sixth Amendment right to counsel by "deliberately and designedly set[ting] out to elicit information from Williams just as surely as and perhaps more effectively than if he had formally interrogated him"); *Massiah v. United States*, 377 U.S. 201, 206 (1964) (holding police violated Massiah's Sixth Amendment right to counsel when they "deliberately elicited" incriminating statements from him). Although Dr. Lord is not a member of the police department, Lt. Karabatsos' testimony shows that, like the 911 operator in *Davis*, Dr. Lord was "at least [an] agent[] of law enforcement" such that her acts could likewise be considered "acts of the police." *Davis*, 547 U.S. at 823 n.2. Dr. Lord's sessions with D.P. thus were more akin to police interrogations than private counseling sessions, a fact that brings this case within the *Crawford-Davis* analysis for determining whether statements given to law enforcement personnel are testimonial evidence.

Lt. Karabatsos' testimony at trial also reveals the testimonial nature of D.P.'s statements. Even more so than Hammon's statements to police in *Davis*, D.P.'s statements to Dr. Lord occurred long after—ten days, to be precise—any emergency situation had passed. *See id.* at 830. The lieutenant unambiguously stated that his "main concern" and the "main reason" for D.P.'s sessions with Dr. Lord "was to try to get the information" that police personnel could not elicit from D.P.—including the identity of the suspects—so that Lt. Karabatsos "could use it in [his] investigation." Because "the primary purpose of the interrogation [wa]s to establish or prove past events potentially relevant to later criminal prosecution," D.P.'s statements are testimonial evidence. *Davis*, 547 U.S. at 822. Accordingly, the district court correctly concluded that the Ohio Court of Appeals unreasonably applied *Crawford* and *Davis*, as fairminded jurists would agree that D.P.'s statements constitute testimonial evidence where they were deliberately elicited in an interrogation-like atmosphere absent an ongoing emergency and used to prove past events in a later criminal prosecution. *See id.* at 827-28.

Because Confrontation Clause violations are subject to harmless-error analysis, *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986), we must next decide whether the Sixth Amendment violation was harmless error under *Brecht v. Abrahamson*, 507 U.S. 619 (1993). *See Ruelas v. Wolfenbarger*, 580 F.3d 403, 412 (6th Cir. 2009) ("[I]n this Circuit[,] . . . *Brecht* is always the test, and there is no reason to ask both whether the state court 'unreasonably' applied *Chapman* under the AEDPA and, further, whether the constitutional error had a 'substantial and injurious' effect on the jury's verdict."); *see also Davis*, 135 S. Ct. at 2199 ("[T]he *Brecht* test subsumes the limitations imposed by AEDPA.").

*Brecht* requires a Confrontation Clause violation to have a "substantial and injurious effect or influence in determining the jury's verdict" before it merits reversal on collateral review. *Brecht*, 507 U.S. at 637. In order to determine whether an error had such an effect or influence, the Supreme Court has instructed the lower federal courts "to ask directly, 'Do I, the judge, think that the error substantially influenced the jury's decision?'" *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995). "The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself

had substantial influence.  If so, *or if one is left in grave doubt*, the conviction cannot stand." *Id.* at 438 (quoting *Kotteakos v. United States*, 328 U.S. 750, 765 (1946)).

When conducting harmless-error analysis of Confrontation Clause violations, this Court utilizes the factors outlined by the Supreme Court in *Van Arsdall*.  *Jensen v. Romanowski*, 590 F.3d 373, 379 (6th Cir. 2009) ("[W]e assess the prejudicial impact of constitutional trial errors under the 'substantial and injurious effect' standard set forth in *Brecht*, examining the error by applying the *Van Arsdall* factors to the facts in the case.").  The Supreme Court reasoned in *Van Arsdall* that whether an error is harmless in a particular case "depends upon a host of factors."  475 U.S. at 684.  Those factors include "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and . . . the overall strength of the prosecution's case."  *Id.*  Applying these factors, we have grave doubts as to whether the Sixth Amendment violation at McCarley's second trial influenced the jury's decision.

The importance of Dr. Lord's testimony to the prosecution's case against McCarley cannot be overstated.  The State relied heavily on her letters in both trials, but they acquired greater significance in the second trial.  In its opinion addressing McCarley's first direct appeal, which resulted in the reversal of his initial conviction, the Ohio Court of Appeals recognized that

> the State relied on the contents of the letter throughout its case and Dr. Lord's testimony was a major portion of the State's evidence against [McCarley]. Moreover, the State specifically relied on the letter in its closing argument when it described the child's comments to Dr. Lord and reiterated that the letters showed the child had twice identified [McCarley] as the killer.

But in the first trial D.P.'s statements were not introduced for the truth of the matter asserted.  At the second trial, D.P.'s statements were introduced—without a limiting instruction—to establish the truth of the matter asserted.  Thus, the State's reliance on the letters was magnified at the second trial because the jury could consider them for the truth of their contents.

Another fact showing the importance of Dr. Lord's testimony is that the prosecution relied heavily on her recitation of D.P.'s statements during closing arguments.  The prosecutor read all of D.P.'s statements from Dr. Lord's testimony in their entirety during his initial closing

argument and commented: "That is what [D.P.] is able to say about what happened to his mother. He is an eyewitness to what happened in this case." Then, during his rebuttal, the prosecutor made the following remarks further illustrating that D.P.'s statements were central to the State's case:

> I tell you that you heard from [D.P.] And what [D.P.] told you is absolutely accurate as to what happened in this case. He said, "the belt from the closet," and he said, "hit with gun." He said, "back of the head and top of the head."
>
> . . .
>
> He said, "pillow." We know she was suffocated with a pillow.
>
> He said, "police ball cap." Very specifically, "police ball cap." He said, "police uniform." He said, "buttons," very specifically.
>
> He said, "nuts in mouth." "Nuts" in mouth.
>
> He tells you exactly what happened to Charlene Puffenbarger, and he tells you exactly who did it. Twice he identified the photograph of Willard McCarley.

Because, according to the prosecutor's own closing argument, D.P.'s statements provided crucial narrative details and the only eyewitness identification of the perpetrator, Dr. Lord's testimony must have been crucial to the prosecutor's case under *Van Arsdall*. This first factor therefore weighs in McCarley's favor.

The next *Van Arsdall* factor is "whether the testimony was cumulative." 475 U.S. at 684. The district court labeled Dr. Lord's testimony "cumulative of testimony provided by three other witnesses—D.P.'s grandmother (Phyllis), Officer Breiding and former deputy Balogh." According to the district court, "the jury heard similar, if not identical, details to those presented through Dr. Lord. The duplicative content of the testimony minimized the importance Dr. Lord's testimony, alone, may have had on the jury's findings."

While the content of Dr. Lord's testimony may well have duplicated some of the content of those other three witnesses, it was not cumulative. Phyllis' testimony consisted of reciting the notes she had taken of D.P.'s nearly-incoherent rambling. Her testimony, standing alone, provides few details about the murder and actually introduces a host of extraneous, uncorroborated facts. Officer Breiding's testimony deals with a time period before D.P. saw Dr. Lord and does establish that D.P. identified every police officer as a potential suspect or as

the perpetrator, but that single detail is hardly overwhelming evidence of McCarley's guilt. Finally, Officer Balogh testified only that McCarley, years later, had possession of sheriff's attire when he had no connection to law enforcement. This possession of contraband law enforcement attire also is not overwhelming evidence of McCarley's guilt.

All of the above testimony paints a clear picture of the crime, but only when considered in light of Dr. Lord's testimony about D.P.'s statements to her. Dr. Lord's testimony therefore was not cumulative, but rather more akin to a keystone holding the arch of the State's case together. Remove that crucial block, especially D.P.'s eyewitness identification, and the State's case collapses into disjointed pieces. This factor therefore weighs in favor of McCarley.

The third *Van Arsdall* factor requires us to consider "the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points." 475 U.S. at 684. The analysis above dealing with whether Dr. Lord's testimony was cumulative of other witnesses' testimony shows that there was significant corroboration of D.P.'s statements at McCarley's trial. This factor therefore weighs in favor of the State.

The next factor, "the extent of cross-examination otherwise permitted," *id.*, also weighs in favor of the State. McCarley had a full opportunity at trial to cross-examine all of the prosecution's witnesses save for D.P.

The final *Van Arsdall* factor we consider is "the overall strength of the prosecution's case." *Id.* Had the jury not heard and considered D.P.'s statements identifying McCarley as the perpetrator, the State's case would have been almost entirely circumstantial. The only physical evidence, the DNA gathered at the scene, was inconclusive. The DNA tests established that the belt used to murder the victim might have contained male DNA from McCarley's paternal relatives, but this evidence is far from overwhelming. D.P.'s younger brother is a male descendant of McCarley, and McCarley's father often visited the house. Furthermore, none of the testimony at trial save for Dr. Lord's included a conclusive identification of McCarley as the murderer. Even considered together, the testimony of Phyllis Puffenbarger, Officer Breiding, and Deputy Balogh does not specifically link McCarley to the murder. In sum, without Dr. Lord's testimony, the prosecution's case was far from "substantial and overwhelming," as the district court described it. This factor therefore weighs in favor of McCarley.

We thus have grave doubts as to whether the violation of McCarley's rights under the Confrontation Clause had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637. Three of the *Van Arsdall* factors—the importance of the testimony, whether it was cumulative, and the overall strength of the prosecution's case— favor McCarley. Dr. Lord's testimony was a crucially important piece of the prosecution's evidence because it contained the only eyewitness identification of McCarley. Her testimony was not cumulative, and the overall strength of the prosecution's case against McCarley was not overwhelming without D.P.'s statements.

Only two of the *Van Arsdall* factors—the presence of corroborating evidence and the extent of cross-examination otherwise permitted—weigh in favor of the State. These factors that favor the prosecution do not carry as much weight as those that favor McCarley. While McCarley had the opportunity to cross-examine all the other witnesses, that he had no opportunity to cross-examine D.P. was the critical error in the state-court proceedings. Additionally, the fact that other testimony corroborates D.P.'s statements underscores the importance of Dr. Lord's testimony. Accordingly, the Confrontation Clause violation at McCarley's second trial was not harmless error under *Brecht* (or, thereby, § 2254(d)). *See Davis*, 135 S. Ct. at 2199.

IV.

Because D.P.'s statements constitute testimonial evidence and the Confrontation Clause violation at McCarley's second trial was not harmless error, we **REVERSE** the district court's denial of McCarley's § 2254 petition and **REMAND** to the district court with instructions to grant McCarley a conditional writ of habeas corpus.