[Cite as *State v. McCarley*, 2018-Ohio-4685.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

| STATE OF OHIO | C.A. No. 28657 |
|---|---|
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| WILLARD MCCARLEY | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO |
| Appellant | CASE No. CR-2004-05-1674-A |

DECISION AND JOURNAL ENTRY

Dated: November 21, 2018

SCHAFER, Presiding Judge.

{¶1} Defendant-Appellant, Willard McCarley, appeals from his convictions in the Summit County Court of Common Pleas. This Court affirms.

I.

{¶2} In 2004, McCarley was arrested in connection with a murder that occurred twelve years earlier. The victim, C.P., was the mother of his son and was in the process of seeking child support from him when she was murdered. On the morning of January 20, 1992, a neighbor entered C.P.'s apartment and discovered her body beneath a blanket on the couch. C.P. had a belt looped around her neck, a small plastic bag in her mouth, and multiple head wounds. The door to her apartment, which required a key to be locked from the outside, was locked when the neighbor arrived.

{¶3} C.P. had two young sons, both of whom were home when she was murdered. The eldest son, who was then three and a half years old, was able to unlock the apartment door for the

neighbor when she arrived. Both that day and in the days that followed, the eldest son indicated that a policeman had hurt his mother. Although the police initially investigated McCarley, the investigation eventually stalled, and the case remained unresolved for a number of years.

{¶4} In 1995, the police arrested McCarley on an unrelated matter. The actual arrest took place at his home in his garage. While McCarley was being taken into custody, one of the officers noticed a deputy sheriff's jacket and hat with a sheriff's insignia hanging on a dolly in the garage. Because McCarley had no law enforcement affiliations, the police confiscated and retained the items.

{¶5} In 2004, DNA testing was performed on swabs taken from each end of the belt that was found looped around C.P.'s neck. Y-STR testing, which had not been available at the time of her murder, uncovered at least two male profiles. When comparing those profiles with McCarley's profile, analysts determined that he could not be excluded as the source of the major profile. Consequently, McCarley was finally arrested for C.P.'s murder.

{¶6} A grand jury indicted McCarley on one count of aggravated murder. His first jury trial resulted in a conviction, but it was overturned on appeal. *See State v. McCarley*, 9th Dist. Summit No. 22562, 2006-Ohio-1176. Because the trial court had improperly vouched for a key witness in the presence of the jury, this Court determined that McCarley had been denied a fair trial. *Id.* at ¶ 19. As such, we remanded the matter for further proceedings. *Id.* at ¶21.

{¶7} On remand, McCarley filed several motions to suppress, including one that challenged the seizure of the sheriff's jacket and hat found in his garage. The trial court held a hearing on his motion and later denied it. The matter then proceeded to a second jury trial. That trial also resulted in a conviction, and McCarley once again appealed. On review, this Court affirmed his conviction. *See State v. McCarley*, 9th Dist. Summit No. 23607, 2008-Ohio-552.

{¶8}    McCarley later moved for habeas relief in federal court, and several years of litigation ensued.  In 2015, the Sixth Circuit Court of Appeals, on remand from the United States Supreme Court, determined that his second trial had resulted in a violation of his rights under the Confrontation Clause.  *See McCarley v. Kelly*, 801 F.3d 652 (6th Cir.2015).  Accordingly, the Sixth Circuit ordered the District Court to issue a conditional writ of habeas corpus, *id.* at 668, and the matter once again came before the trial court for further proceedings.

{¶9}    A third jury trial was held, at the conclusion of which the jury found McCarley guilty of aggravated murder.  The court sentenced him to life in prison with the possibility of parole in 20 years.  In its sentencing entry, the court wrote that McCarley would be eligible for parole "after Twenty (20) full years."

{¶10}  McCarley now appeals from his conviction and raises three assignments of error for our review.  For ease of analysis, we rearrange the assignments of error.

II.

## Assignment of Error II

**The trial court erred when it denied the motion to suppress the sheriff's coat and hat found in Willard McCarley's garage.**

{¶11}  In his second assignment of error, McCarley argues that the trial court erred by denying his motion to suppress.  Because McCarley is precluded from raising this issue, we overrule his assignment of error.

{¶12}  "The doctrine of law of the case 'provides that the decision of a reviewing court in a case remains the law of that case on the legal questions involved for all subsequent proceedings in the case at both the trial and reviewing levels.'"  *State v. Chapman*, 190 Ohio App.3d 528, 2010-Ohio-5924, ¶ 7, quoting *Nolan v. Nolan*, 11 Ohio St. 3d 1, 3 (1984).  The doctrine "is rooted in principles of res judicata and issue preclusion * * *."  *State v. Fischer*, 128

Ohio St.3d 92, 2010-Ohio-6238, ¶ 35. "Thus, [it] has been applied to preclude a litigant 'from attempting to rely on arguments at a retrial [that] were fully pursued, *or available to be pursued*, in [an earlier] appeal.'" (Emphasis added.) *State v. Hartman*, 9th Dist. Medina No. 12CA0057-M, 2013-Ohio-4407, ¶ 6, quoting *Chapman* at ¶ 7.

{¶13} McCarley filed his motion to suppress before his second trial, and the court denied his motion at that time. McCarley could have challenged the court's suppression ruling when pursuing his second direct appeal, but he did not do so. And while McCarley secured federal relief, that relief only pertained to errors that occurred at his trial. It did not address any pretrial proceedings or rulings. Accordingly, McCarley may not now litigate an issue that was available to be pursued in his earlier appeal. *Hartman* at ¶ 6-7. His argument "is subject to issue preclusion pursuant to the law of the case doctrine." *Id.* at ¶ 7, citing *Chapman* at ¶ 8. Thus, his second assignment of error is overruled on that basis.

## Assignment of Error I

**Willard McCarley's conviction is against the manifest weight of the evidence, in violation of the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 16 of the Ohio Constitution.**

{¶14} In his first assignment of error, McCarley argues that his conviction is against the manifest weight of the evidence. Specifically, he argues that the jury lost its way when it concluded that he was the individual who perpetrated C.P.'s murder. We disagree.

{¶15} In determining whether a criminal conviction is against the manifest weight of the evidence, this Court is required to consider the whole record, "weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered."

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court * * * disagrees with the fact[-]finder's resolution of the conflicting testimony." *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). An appellate court should exercise the power to reverse a judgment as against the manifest weight of the evidence and grant a new trial "only in exceptional cases where the evidence weighs heavily against the conviction." *Otten* at 340.

{¶16} At the time of her death, C.P. was 26 years old and lived in a small apartment with her two boys. Her eldest son was about three and a half then, and her youngest son was about a year younger. C.P.'s mother testified that the two boys had different fathers and McCarley was the father of the youngest boy. Although the eldest boy's father paid child support, C.P. did not receive any child support from McCarley. Indeed, there was testimony that he questioned the boy's paternity even after he obtained the results of a paternity test. C.P.'s mother testified that C.P. babysat other children at her apartment to earn money, but was otherwise unemployed and in dire financial shape. She and several others testified that they repeatedly encouraged C.P. to seek child support from McCarley. In late November 1991, less than two months before her murder, C.P. finally did so in conjunction with her request for welfare benefits. The State produced evidence that she and McCarley were scheduled to appear in court for a pretrial hearing on February 6, 1992.

{¶17} Sometime during the weeks leading up to C.P.'s murder, an old acquaintance of McCarley's spotted him while waiting in line at the unemployment office. The acquaintance testified that he had gone to school with McCarley and also knew C.P. because she was friends with his sister. When he saw McCarley, the two began talking, and McCarley began

complaining about C.P. taking him to court to secure child support. According to the acquaintance, McCarley appeared to be angry while discussing C.P. and "said he would kill her first before he would pay child support." The acquaintance testified that their conversation ended shortly thereafter and he dismissed McCarley's threat because he did not take him seriously.

{¶18} There was testimony that, four days before her murder, C.P. went to visit her mother at her mother's place of employment. Both her mother and her mother's close friend/co-worker spoke with C.P. that afternoon. They each testified that C.P. was uncharacteristically quiet and appeared anxious about the impending child support action. Her mother stated that C.P. had filed court papers that day and was nervous because she was "very afraid" of McCarley. Likewise, the friend/co-worker stated that C.P. looked scared and "distraught." She testified that she spoke with C.P. for over an hour that day and tried to reassure her that "getting child support was a normal thing and [] she had nothing to be afraid of."

{¶19} There was evidence that, two days before her murder, C.P. had an argument with McCarley in the parking lot of her apartment complex. First, one of C.P.'s neighbors recalled seeing her speaking with an unidentifiable person in a car and snatching her arm away when the person grabbed it. Second, C.P.'s close friend testified that C.P. came to her office that day because she had just had a fight with McCarley. The friend testified that C.P. had been nervous about seeking child support because she knew it would make McCarley "really angry." That day, C.P. was "panic stricken" as she described how McCarley had just "threatened her and said to stop the proceedings because she would not live to see the court date if she didn't." The friend testified that she encouraged C.P. to go to the police, but C.P. rejected the idea because it would simply be her word against McCarley's. Finally, a man who had just begun dating C.P. also saw

her that day. The man testified that C.P. came to his workplace and told him that she had just had a fight with the father of her youngest son regarding child support. The man also testified that C.P. looked as if she had been crying and appeared agitated.

{¶20} C.P. saw her mother again the day before her murder. Her mother testified that she picked up C.P. and her boys and brought them to her house for most of the day. During that time, C.P. was "very, very fidgety" and upset over an argument she had had with McCarley the previous day. According to C.P.'s mother, C.P. told her that McCarley had said "he would see her dead before he would pay child support." She testified that C.P. was "very terrified" as a result of that conversation, but declined her offer to spend the night because she had to babysit at her apartment the following morning. C.P.'s mother last saw C.P. alive when she brought her and the boys back to their apartment that evening.

{¶21} The following morning, a neighbor of C.P.'s brought her two children to C.P.'s apartment so that C.P. could babysit them. The neighbor found the apartment door locked, however, and no one answered when she repeatedly knocked. The neighbor could hear C.P.'s sons playing inside, so she called to them and ultimately succeeded in getting the older boy to unlock the door. Once inside, she saw a person she believed to be C.P. lying on the couch beneath a blanket. She thought C.P. might be sleeping, so she walked over and nudged her. When that did not work, she pulled the blanket away from C.P.'s head, saw a significant amount of blood, and realized C.P. was dead. She then fled the apartment and sought help from a neighbor who lived directly below C.P.

{¶22} The downstairs neighbor testified that she had stayed awake the previous night, waiting for a television show that was scheduled to air around midnight or 1:00 a.m. Around that time, she heard several noises coming from C.P.'s upstairs apartment, including a stomping

noise, a "rumbling" noise, and the sound of running water. She testified that she did not realize anything was wrong until the following morning when the neighbor who discovered C.P.'s body came to her door asking for help. At that point, the downstairs neighbor went to C.P.'s apartment, collected all of the children, and called the police.

{¶23} There was evidence that, when C.P.'s body was discovered, she had a belt wrapped around her neck and a small, plastic bag in her mouth. Her head was lying on a blood-stained pillow, and there was a second blood-stained pillow by her feet. Dr. Lisa Kohler was not the medical examiner at the time of C.P.'s murder, but reviewed the autopsy report, any related reports, and the notes of her predecessor for trial. She testified that C.P. died as a result of cardiorespiratory arrest caused by asphyxiation, meaning that someone had placed an object over her head and nose "with an effort also at strangulation." Dr. Kohler found reasonable her predecessor's opinion that the blood-stained pillow found by C.P.'s feet had been used to suffocate her. She noted, however, that C.P. also had ligature marks on her neck from the belt and multiple head wounds. She testified that C.P. had been struck in the head at least five times with a blunt object and her hands and arms displayed "defensive type" abrasions. Dr. Kohler opined that the head wounds were significant, would have caused a lot of bleeding, and likely would have rendered C.P. either unconscious or unable to fully function. She estimated that C.P. died during the early morning hours of January 20, 1992, possibly between 12:00 a.m. and 1:00 a.m.

{¶24} C.P.'s eldest son was 28 years old at the time of McCarley's third trial. He testified that, for a long time, he could not remember what happened the night of his mother's murder, but he eventually began having flashbacks that allowed him to recall certain details. He recalled being in his bedroom when he heard a loud scream. Leaving his younger brother asleep,

he came out into the hallway and peeked into the living room. He recalled seeing his mother on the couch below their window and two men, the taller of whom was wearing a black coat. As his mother argued with the taller man, he remembered the man putting a pillow on his mother's head and his mother struggling and kicking her legs toward the window. After that, he recalled the two men arguing and one of them finally noticing him. He testified that man then came over, told him to go back to bed, and threatened to kill him if he said anything. Though he returned to his bedroom, he came out again later and walked to the bathroom where he saw one of the men "wiping down the wall by the bathtub." That same wall "fluoresce[d] tremendously" when Officer John Boykin sprayed it with Luminol. Officer Boykin explained that Luminol fluoresces when mixed with chemicals such as bleach. He testified that, once he sprayed the bathroom walls, he was able to see streak marks on them. According to the officer, the walls looked as if someone had recently taken a rag to them.

{¶25} Apart from the testimony that C.P.'s eldest son tendered as an adult, other witnesses testified regarding statements he made around the time of the murder. Officer Eric Breiding was the first officer to respond to C.P.'s apartment the morning her body was found and encountered her boys at a neighbor's apartment. He testified that, as soon as C.P.'s eldest son saw him, the boy "blurted out, 'He did it. He hurt mommy.'" Officer Breiding testified that the eldest son made that same statement each time he saw a uniformed officer that morning. Indeed, even later that same evening, the eldest son reacted to Officer Breiding's uniform when Officer Breiding accompanied Detective John Karabatsos to interview C.P.'s mother at her house. The detective testified that, as soon as C.P.'s eldest son saw Officer Breiding, he appeared fearful, pointed to him, and stated, "'The policeman did it.'"

{¶26} A few days later, the eldest son made a series of statements while staying at C.P.'s mother's house. C.P.'s mother wrote down his statements so as not to forget them and read her notes for the jury. According to C.P.'s mother, the eldest son stated:

"I am going to get the belt. A policeman. Go kick that window. Phone. Get the stick. I'm going to shoot you. Kick the window. Bathroom. Are you out of here. Don't have no fun. You got a phone. A policeman. My mom seen the policeman. Gun. Threw in garage. Sleeping on couch. I'm going to crack you. Kick the window. Not getting out of here. Bob. I'm not going to your house. Corner. Call Paw Paw. Get your radio. Go to sleep. Don't shoot. Paw Paw. Got the paper. Policeman did it not the guy. Lights on. Big light. No telephones. You hear me. Policeman got buttons. What you come my house for. What you do that to my mom. You break window. Bob. Policeman hit my mommy. Put tape on her. Put nuts in her mouth.

C.P.'s mother testified that, at the time the eldest son made the foregoing statements, he had tears in his eyes, was motioning to his neck, and was sitting nearby a picture of C.P.

{¶27} Officer Breiding testified that C.P.'s apartment door had one dead bolt and, to lock the door from the outside, one had to have a key. The neighbor who discovered C.P.'s body found the door locked when she arrived, and Officer Breiding confirmed that C.P.'s key was never found. There were no signs of forced entry, and the investigating officers testified that the scene did not appear to be consistent with a robbery or drug-related incident.

{¶28} In 1992, Detective Dennis Balogh and another detective went to McCarley's home to arrest him in connection with an unrelated warrant. Detective Balogh had aided in C.P.'s murder investigation, so he knew that her eldest son had blamed a policeman for her murder. He testified that McCarley's garage door was open when they arrived, and McCarley was inside the garage area. While arresting McCarley, Detective Balogh saw a black deputy sheriff's jacket and hat with a sheriff's insignia plainly hanging on a dolly in the garage. Because McCarley had no law enforcement affiliations, the detective confiscated the items. A

former co-worker of McCarley's confirmed that he had seen McCarley wearing a police jacket to work on several occasions.

{¶29} There was evidence that the belt found around C.P.'s neck matched a leather jacket that she kept in her apartment closet. Swabs taken from each end of the belt were subjected to Y-STR testing in 2004 and again in 2016 due to advancements in testing. The analysts responsible for each set of tests testified that the profiles of at least two males were detected within the belt samples and that McCarley could not be excluded as the source of the major profile. Because all males within a familial line have identical Y-chromosome profiles, however, the analysts were careful to note that they also could not exclude any male relatives of McCarley's (e.g., his son) as the source of that major profile.

{¶30} During his case-in-chief, McCarley presented the testimony of his former girlfriend, his sister, and his mother. The former girlfriend testified that she was with McCarley on the day he allegedly argued with C.P. in the parking lot of her apartment complex. The former girlfriend described their conversation as civilized and denied that they argued or that McCarley threatened C.P. Though no one else saw the former girlfriend in McCarley's car that day, she claimed that she had her seat in a partially reclined position, such that it would have been difficult to see her.

{¶31} McCarley's sister testified that she and McCarley both used to live at their parents' home. She testified that she arrived home between 12:00 and 1:30 a.m. on the night of C.P.'s murder and McCarley's car was already parked in the driveway. She never actually saw McCarley after arriving home, but heard the basement television on and assumed he was down there. She testified that the family had two dogs and, had McCarley arrived home after her, she

would have heard the dogs react. Even so, she admitted that she could not remember when she next saw McCarley.

{¶32} McCarley's mother also testified that McCarley was at home when C.P.'s murder was thought to have occurred. She testified that she remembered that particular weekend because she was bedridden as the result of an allergic reaction. She recalled that, during the day leading up to the murder, McCarley had gone to dinner with his fiancée and had arrived home around 11:00 p.m. She stated that she knew he was home because he visited with her for a while before going to bed. Much like her daughter, she testified that she would have heard their dogs react if McCarley had left again and returned later on. She admitted on cross-examination, however, that she had health problems around the time of the murder and those problems affected her memory.

{¶33} McCarley argues that his aggravated murder conviction is against the manifest weight of the evidence because the State's case was entirely circumstantial and virtually all of its witnesses either exaggerated or fabricated their testimony. With respect to C.P.'s mother, he notes that she never told the police he threatened C.P.'s life. He argues that the alleged threat only came to light when the mother testified and, had it actually happened, she would have told the police about it earlier on. Likewise, with respect to the mother's close friend/co-worker, McCarley argues that her testimony lacks credibility because there was no evidence that she spoke with the police before 2003. As for the co-worker who testified that McCarley sometimes wore a sheriff's jacket, McCarley argues that the co-worker did not come forward until he was facing federal charges and benefited from the self-serving testimony that he offered. McCarley also points to inconsistencies and reporting delays in the testimony of C.P.'s close friend and the neighbor who allegedly saw someone in a car grab C.P.'s arm before she snatched it away.

{¶34} Having reviewed the record, we cannot conclude that the jury lost its way when it determined that McCarley perpetrated C.P.'s murder. The State produced a large amount of circumstantial evidence that, when viewed collectively, implicated McCarley. *See State v. Taylor*, 9th Dist. Summit No. 27273, 2015-Ohio-403, ¶ 9 ("As with any other element, * * * identity may be proved by direct or circumstantial evidence, which do not differ with respect to probative value."). There was evidence that McCarley was angry with C.P. for seeking child support, that she was afraid of him, and that he threatened her life a few days before her murder. While C.P.'s mother may have failed to report that specific threat at an earlier date, she was not the only witness who testified that McCarley verbally threatened C.P.'s life. Moreover, she told the police that C.P. was very fearful of McCarley and that he had just confronted her about the child support proceedings. To the extent that she or other witnesses delayed reporting certain information or waited to come forward, the jury was "in the best position to determine [their] credibility * * * and evaluate their testimony accordingly." *State v. Johnson*, 9th Dist. Summit No. 25161, 2010-Ohio-3296, ¶ 15.

{¶35} The jury heard testimony that C.P.'s eldest son reacted fearfully when encountering uniformed officers and indicated that a policeman had hurt his mother. Because the State produced evidence that McCarley owned and sometimes wore a deputy sheriff's jacket and hat, the jury reasonably could have inferred that he was wearing those items when the murder occurred. Moreover, there was evidence that McCarley could not be excluded as the source of the major profile that analysts uncovered when testing samples taken from the ends of the belt that was used to strangle C.P. Although McCarley and his son shared a Y-STR profile, the jury reasonably could have concluded that the profile the analysts uncovered was attributable to the attack and McCarley rather than to any prior, incidental touching on the part of his son.

Upon review, this is not the exceptional case where the jury lost its way by convicting McCarley. *See Otten*, 33 Ohio App.3d at 340. We, therefore, reject his argument that his conviction is against the manifest of the evidence. McCarley's first assignment of error is overruled.

**Assignment of Error III**

**The trial court's imposition of life imprisonment with parole eligibility after twenty full years was contrary to law and violated the prohibition against ex post facto and retroactive penalty enhancements.**

{¶36} In his third assignment of error, McCarley argues that his sentence is contrary to law. Because McCarley is precluded from raising this issue, we overrule his assignment of error.

{¶37} In general, a defendant who is convicted of a felony may appeal his sentence on the basis that it is contrary to law. *See* R.C. 2953.08(A)(4). If the sentence is one "imposed for aggravated murder or murder pursuant to [R.C.] 2929.02 to 2929.06," however, it "is not subject to review under [R.C. 2953.08]." R.C. 2953.08(D)(3). The Ohio Supreme Court has recognized that "R.C. 2953.08(D) clearly precludes review of individual murder sentences imposed pursuant to [those sections] * * *." *State v. Porterfield*, 106 Ohio St.3d 5, 2005-Ohio-3095, ¶ 19.

{¶38} McCarley's argument is that his aggravated murder sentence does not comport with Former R.C. 2929.03. He has not challenged his sentence on any other grounds. *See, e.g., State v. Williams*, 148 Ohio St.3d 403, 2016-Ohio-7658 (reviewing sentences for aggravated murder and murder on grounds that defendant was sentenced to allied offenses); *Porterfield* at ¶ 19-24 (noting that R.C. 2953.08(D) would not bar a challenge based on the imposition of consecutive life sentences because they are not imposed pursuant to R.C. 2929.02 to 2929.06). Because R.C. 2953.08(D)(3) "clearly precludes review of individual murder sentences imposed

pursuant to [R.C. 2929.03]," we cannot review the merits of McCarley's argument.[1] *Porterfield* at ¶ 19. As such, his assignment of error is overruled.

III.

**{¶39}** McCarley's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

JULIE A. SCHAFER
FOR THE COURT

---

[1] We would note that our holding does not impact the availability of any relief that might be afforded pursuant to Crim.R. 36.

TEODOSIO, J.
CALLAHAN, J.
CONCUR.


APPEARANCES:

CRAIG M. JAQUITH and PETER GALYARDT, Assistant Public Defenders, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and JACQUENETTE S. CORGAN, Assistant Prosecuting Attorney, for Appellee.