# United States Court of Appeals
## For the Eighth Circuit

_____

No. 14-2718

_____

United States of America

*Plaintiff - Appellee*

v.

William Clifford

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of South Dakota - Rapid City

_____

Submitted: May 15, 2015
Filed: June 30, 2015

_____

Before RILEY, Chief Judge, BRIGHT and MURPHY, Circuit Judges.

_____

MURPHY, Circuit Judge.

William Clifford was charged with assault with a dangerous weapon and assault resulting in serious bodily injury in violation of 18 U.S.C. §§ 113(a)(3), (6), 1153, and 2. At trial the district court[1] admitted an out of court statement by the

_____

[1]The Honorable Jeffrey L. Viken, United States District Judge for the District of South Dakota.

victim's three year old son that "Will and King hurt mama." Clifford objected to this evidence based on the Confrontation Clause of the Sixth Amendment. A jury convicted Clifford of simple assault and assault resulting in serious bodily injury, and he appeals. We affirm.

During the evening of October 16, 2012, a group of people including William Clifford, King Martinez, Kealey Twiss, Twiss's boyfriend Sean Davis, Marvin "Joe" Brave, Craig Chase, and Gary Rowland, Jr. were drinking alcohol together in the basement of a home on the Pine Ridge Indian Reservation. J.W.W., Twiss's three year old son, was also present. Around 7:00 p.m., Twiss asked Davis to get a transmitter so they could listen to some music. When Davis left to get the transmitter, Twiss and J.W.W. were sitting on a bed, Rowland was sleeping on a couch, Brave, Chase, and Clifford were sitting on folding chairs, and Martinez was standing off to the side by the radio.

Davis was gone for approximately five minutes. On his return he saw Clifford, Martinez, Brave, and Chase walking up the stairs from the basement. Davis heard J.W.W. crying as he entered the basement which was divided into four spaces by hanging sheets. J.W.W. had a sheet "wrapped around him like a blanket[,] hiding" and ran to Davis in tears and held onto his leg. When Davis asked him, "What's wrong?", J.W.W. said, "Mama's hurt." Davis asked, "Where?", and J.W.W. pulled back one of the sheets to show Twiss lying "face first on the ground . . . unconscious in a pool of blood." The floor of the basement was uncarpeted concrete. Davis asked, "What happened?" and J.W.W. replied, "Will and King hurt mama." At the time he made this statement, J.W.W. was "hysterically crying," "shaking," and "latched onto [Davis's] leg; he didn't want to let go. He was scared."

Twiss was still unconscious, and Davis carried her out of the basement and to her home. As Twiss regained consciousness, she began crying and said that her head hurt. Davis and her relatives took her to the emergency room at the Pine Ridge

Hospital, but she insisted on leaving because "other patients in the waiting room were staring at her laughing because she was basically all bloody and looked pretty rough." Her face was bruised, scraped, and badly swollen, with "purple raccoon eyes," one of which was bleeding. They took her home but when she "scream[ed]" from head pain after resting for about 30 minutes, they "rushed her back to the [Pine Ridge] hospital." Twiss was later transported by airplane to Rapid City Regional Hospital where she was diagnosed with a skull fracture and a subdural hematoma, a type of traumatic brain injury.

At trial Twiss testified about what had happened to her in the basement. Martinez had approached her and pulled on her shirt, apparently trying to expose her breasts. When she asked him to stop, he hit her. Twiss tried to light a cigarette but dropped her lighter. When she bent down to pick it up, a small pocket knife from her father's car fell from her shirt onto the floor. Clifford picked up the knife and asked her, "what [she] was going to do with it." Twiss thought he was joking, so she giggled and said, "Whatever." Clifford then struck her face, and she ended up on the floor covering her head. Before she lost consciousness, Clifford and Martinez kicked her "in the head" and she "hear[d] [her] son screaming."

Davis later testified that Martinez had remarked earlier that day about "how pretty [Twiss] was and . . . how she should be treated by a real Native man, and what he would like to do to her." Clifford also had said, "they should take [Davis] out somewhere and kidnap [him] and beat [him] up and take [his] girlfriend from [him]." At the time Davis thought Clifford and Martinez were joking.

A grand jury indicted Clifford and Martinez on one count of assault with a dangerous weapon and one count of assault resulting in serious bodily injury in violation of 18 U.S.C. §§ 113(a)(3), (6), 1153, and 2. Clifford filed a motion in limine to exclude J.W.W.'s statements about "Will and King" hurting his mother. The district court held a motion hearing just before trial at which Davis described the

-3-

scene around the time of J.W.W.'s comments, including that J.W.W. was "crying, in shock, in tears . . . scared . . . shaking." Davis testified that their entire conversation took less than two minutes. The district court then ruled that the statements "Mama's hurt" and "Will and King hurt mama," as well as J.W.W.'s nonverbal statement showing where Twiss was lying on the floor, were admissible as nontestimonial excited utterances made during an ongoing emergency.

At trial Davis testified about J.W.W.'s statements. Other evidence included testimony by Twiss describing the assault on her and identifying Martinez and Clifford as her assailants, as well as from her treating physician. Clifford testified and admitted that he had kicked Twiss multiple times, but he claimed he had acted in self defense because Twiss had been holding a knife. Brave, who was called as a defense witness, similarly testified that while Clifford had shoved, kicked, and stomped on Twiss, he had appeared to be defending himself. The jury acquitted Martinez of both charges against him, but it convicted Clifford of simple assault, a lesser included offense of assault with a dangerous weapon, and of assault resulting in serious bodily injury. The district court subsequently sentenced Clifford to 46 months imprisonment.

The sole issue on Clifford's appeal is whether the admission of J.W.W.'s statement that "Will and King hurt mama" violated his rights under the Confrontation Clause of the Sixth Amendment. We review de novo the admission of evidence over such an objection. United States v. Williams, 720 F.3d 674, 698 (8th Cir. 2013).

The Confrontation Clause bars the admission of testimonial hearsay unless the declarant is unavailable and the defendant has had a prior opportunity for cross examination. Crawford v. Washington, 541 U.S. 36, 68 (2004). The Supreme Court has not "attempt[ed] to produce an exhaustive classification of all conceivable statements . . . as either testimonial or nontestimonial." Davis v. Washington, 547 U.S. 813, 822 (2006); see also Michigan v. Bryant, 131 S. Ct. 1143, 1155 (2011).

-4-

The Court has previously instructed that a statement made in response to questioning by law enforcement requires that a court "objectively evaluate the circumstances in which the encounter occurs and the statements and actions of the parties" to determine "the primary purpose of the interrogation." Bryant, 131 S. Ct. at 1156. Statements made in response to a police interrogation intended to "creat[e] an out-of-court substitute for trial testimony" are testimonial. Id. at 1155. Witness statements are nontestimonial, however, when "the primary purpose of an interrogation is to respond to an 'ongoing emergency.'" Id.

Here, no law enforcement officials or other agents of the state were involved in asking questions that elicited J.W.W.'s statement, "Will and King hurt mama." Clifford claims that Davis's relationship with J.W.W. was like that of a parent and argues that therefore his questions to a very young child had the same effect as questions from a police officer, but he identifies no case in which questions from a private individual acting without any direction from state officials were determined to be equivalent to police interrogation. To the contrary, we have previously determined that a foster parent's questions to a child about visible injuries did not produce testimonial statements because the foster parent was not an agent of the state. United States v. Peneaux, 432 F.3d 882, 896 (8th Cir. 2005).

The record further shows that the primary purpose of Davis's questions was not to collect information for future prosecution. After having been briefly absent, Davis returned to the basement to find J.W.W. "hysterically crying" and "scared" and Twiss lying on the floor "unconscious in a pool of blood." Given this context, his simple question, "What happened?" sought to determine how to respond to an obvious emergency rather than to solicit prosecutorial information. His inquiry "lacked the 'formality of . . . questioning,' the substantial 'government involvement,' and 'the law enforcement purpose'" which may produce testimonial statements. Peneaux, 432 F.3d at 896, quoting United States v. Bordeaux, 400 F.3d 548, 555-56 (8th Cir. 2005).

Under these circumstances the admission of J.W.W.'s statement did not violate Clifford's rights under the Confrontation Clause.

After Clifford's appeal was briefed, the Supreme Court issued a significant decision on June 18, 2015 which applied the Confrontation Clause in a private setting. Ohio v. Clark, 576 U.S. ___, 2015 WL 2473372 (2015). In Clark, a three year old child arrived at a day care facility with visible injuries and identified his abuser in response to questions from a teacher. Id. at *2. The child's hearsay statements were admitted at a criminal trial. Id. at *3. Addressing the defendant's Confrontation Clause challenge, the Court "decline[d] to adopt a categorical rule" to the effect that statements made to private individuals do not raise confrontation concerns while noting that "such statements are much less likely to be testimonial than statements to law enforcement officers." Id. at *6. The Court identified several circumstances contributing to its determination that the evidence had not implicated the Confrontation Clause. These include that the questions and answers "were primarily aimed at identifying and ending the threat" and protecting the victim, that the "conversation . . . was informal and spontaneous," that the hearsay declarant was a very young child, and that the teachers asking the questions were not "principally charged with uncovering and prosecuting criminal behavior." Id. at *6-*8.

Clark further supports our conclusion that there was no Confrontation Clause violation here. As in Clark, the record here shows an informal, spontaneous conversation between a very young child and a private individual to determine how the victim had just been injured. J.W.W.'s age is significant since "[s]tatements by very young children will rarely, if ever, implicate the Confrontation Clause" because "it is extremely unlikely that a 3-year-old child . . . would intend his statements to be a substitute for trial testimony." Clark, 2015 WL 2473372 at *7.

The statement "Will and King hurt mama" was also properly admitted under the hearsay exception for an excited utterance, defined as "[a] statement relating to

a startling event or condition, made while the declarant was under the stress of excitement that it caused." Fed. R. Evid. 803(2). The record here clearly established that J.W.W. was under great stress caused by witnessing a serious assault on his mother. He was crying, shaking, and scared. His answer to Davis's question was directly related to the assault that had startled him. The district court therefore did not err in admitting his statement through Davis's testimony.

The judgment of the district court is affirmed.

_____