*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

SCOTT RICHARD JUREWICZ,

Defendant-Appellant.

FOR PUBLICATION
August 6, 2019
9:10 a.m.

No. 342193
Jackson Circuit Court
LC No. 15-004930-FC

Before: O'BRIEN, P.J., and FORT HOOD and CAMERON, JJ.

FORT HOOD, J.

Defendant appeals as of right his jury convictions for felony murder, MCL 750.316(1)(b), and first-degree child abuse, MCL 750.136b(2). Defendant was sentenced to life without the possibility of parole for his felony murder conviction, and 50 to 75 years' for the child abuse conviction. Defendant contends on appeal that he is entitled to a new trial because (1) his trial counsel was ineffective for failing to call expert witnesses, and (2) his constitutional right to confront the witnesses against him was violated by the admission of hearsay statements made by two, approximately three-year-old children. We affirm.

## I. FACTUAL BACKGROUND

This case arises out of defendant's murder of an 18-month-old child. On March 14, 2015, defendant and his son, together with defendant's then-girlfriend and her three children, EH, LH, and BH, ate a spaghetti dinner. After dinner, defendant put BH to bed. BH became fussy and defendant became frustrated, so defendant "shook [BH] a little bit" and "put him back down hard[]" in his crib. BH abruptly stopped crying, and defendant went downstairs. After a few minutes, defendant returned upstairs to check on BH. According to defendant, when he returned upstairs he discovered noodles spilling out of BH's mouth, and BH was lifeless and purple. First responders were able to restart BH's heart, but he was immediately placed on life support and died three days later. A CAT scan showed that an "overall loss of oxygen for a period of time caused brain damage and the cells of the brain to die." BH had retinal hemorrhages in both eyes, and an MRI showed swelling in his spine.

-1-

After BH's death, BH's mother left defendant and defendant began dating again. Two months later, defendant was present when his new girlfriend's young son, JP, was found smothered to death in his crib. During the same time that BH's death was being investigated, Child Protective Services (CPS) was investigating EH and LH's home to ensure their safety. Following JP's death, CPS also began investigating the home of JP's brother, SC, to ensure SC's safety. During separate forensic interviews with CPS, SC and EH each made statements that they had been choked by defendant. Defendant was eventually charged and convicted with BH's murder on a theory that the cause of BH's death was homicide from blunt force trauma. He now appeals his convictions. We affirm.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant first argues that his trial counsel was ineffective for failing to call any witnesses to testify on defendant's behalf. Specifically, defendant contends that his trial attorney failed to call Dr. Leslie Hamilton and Dr. Michael Pollanen as expert witnesses. We disagree.

Generally, "[t]he question whether defense counsel performed ineffectively is a mixed question of law and fact; this Court reviews for clear error the trial court's findings of fact and reviews de novo questions of constitutional law." *People v Trakhtenberg*, 493 Mich 38, 47; 826 NW2d 136 (2012). Because no *Ginther*[1] hearing was held, this Court's review is limited to mistakes apparent on the record. *People v Payne*, 285 Mich App 181, 188; 774 NW2d 714 (2009).

Both the United States Constitution and the 1963 Michigan Constitution guarantee defendants the right to effective assistance of counsel. US Const, Am VI; Const 1963, art 1, § 20. To obtain a new trial on the basis of ineffective assistance, a defendant must show that (1) trial counsels' performance fell below an objective standard of reasonableness, and (2) but for counsel's deficient performance, there is a reasonable probability that the outcome would be different. *Strickland v Washington*, 466 US 668; 104 S Ct 2052; 80 L Ed 2d 674 (1984); *People v Pickens*, 446 Mich 298; 521 NW2d 797 (1994). Defendant must overcome a strong presumption that counsel's performance was sound trial strategy. *Strickland*, 466 US at 689. Defendant must also show that defense counsel's performance so prejudiced him that he was deprived of a fair trial. *Pickens*, 446 Mich at 338. To establish prejudice, defendant must show a reasonable probability that the outcome would have been different but for counsel's errors. *Strickland*, 466 US at 694. A reasonable probability need not be a preponderance of the evidence; rather, a "reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*.

Defense attorneys retain the "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary," but have wide discretion as to matters of trial strategy. *Id*. at 691; *People v Heft*, 299 Mich App 69, 83; 829 NW2d 266 (2012). This Court will not substitute its judgment for that of counsel regarding matters of trial strategy, nor will it assess counsel's competence with the benefit of hindsight. *Strickland*, 466 US at 689; *Payne*, 285 Mich App at 190. The fact that defense counsel's strategy ultimately

---

[1] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

failed does not render it ineffective assistance of counsel. *People v Stewart*, 219 Mich App 38, 42; 555 NW2d 715 (1996). Defense counsel's decisions regarding whether to call a witness are presumptively matters of trial strategy. *People v Russell*, 297 Mich App 707, 716; 825 NW2d 623 (2012). "The failure to call witnesses only constitutes ineffective assistance of counsel if it deprives a defendant of a substantial defense. Similarly, the failure to make an adequate investigation is ineffective assistance of counsel if it undermines confidence in the trial's outcome." *Id.* (quotation marks, citations, and alteration omitted).

We first address defendant's argument that his trial counsel was ineffective because he failed to call Dr. Hamilton as an expert witness. Dr. Hamilton reviewed BH's medical records and authored a report opining that there was no evidence of trauma in BH's spine; rather, in Dr. Hamilton's opinion, the damage to BH's spine was caused by whatever unidentified event caused his brain to swell, which was not necessarily a "shaking-type trauma." Dr. Hamilton ultimately concluded that "it [was] not possible to make the neuropathologic diagnoses of 'shaking' or 'whiplash,'" which largely contradicted the prosecution's theory of the case. Defendant argues that defense counsel erred when he failed to call Dr. Hamilton as a witness to present these conclusions to the jury, and that this failure prejudiced him. We disagree.

Defendant has not shown that Dr. Hamilton's testimony would have provided him a "substantial defense" not otherwise available. See *id.* This is because the conclusions contained in Dr. Hamilton's report *were*, in fact, presented to the jury. First, defendant's counsel presented Dr. Hamilton's report during the testimony of Dr. Carl Schmidt, and Dr. Schmidt confirmed more than once that Dr. Hamilton did not believe BH's injuries could have been "caused by shaking." Dr. Hamilton's report was then presented a second time during the testimony of Dr. Evan Matshes. Dr. Matshes confirmed that Dr. Hamilton had concluded there was no evidence of whiplash, shaking, or jerking. With two separate experts testifying to the conclusions derived from Dr. Hamilton's report, we fail to see how calling Dr. Hamilton as a witness would have provided any new information for the jury to consider. Indeed, trial counsel's tactic of not calling Dr. Hamilton as a witness enabled the defense to use her expert opinion to undermine the prosecution's expert witnesses' conclusions without exposing Dr. Hamilton to the prosecution's cross examination. Accordingly, we cannot conclude that defense counsel's decision not to call Dr. Hamilton deprived defendant of a substantial defense.

Defendant also argues that his counsel was ineffective for failing to call Dr. Pollanen. Dr. Pollanen also authored a report and concluded that the cause and manner of BH's death could not be determined. Again, defendant has not shown that Dr. Pollanen's testimony would have provided him a substantial defense not otherwise available. Dr. Pollanen's conclusions were also presented to the jury via the testimony Dr. Matshes, as well as the testimony of Dr. Jeffrey Jentzen. Dr. Matshes testified as to Dr. Pollanen's conclusion that the cause and manner of BH's death were undeterminable, even noting that he initially agreed with that conclusion. The following day, Dr. Jentzen testified that he had reviewed Dr. Pollanen's report and explained that Dr. Pollanen "couldn't call [BH's death] a homicide." As with Dr. Hamilton, two expert witnesses testified as to Dr. Pollanen's conclusions, and defendant has failed to establish that Dr. Pollanen would have provided any new information that would amount to a substantial defense not otherwise provided.

-3-

Because it has not been shown that failure to call Dr. Hamilton and Dr. Pollanen deprived defendant of a substantial defense, we cannot conclude that defense counsel's actions fell below an objectively reasonable standard. Without needing to reach the issue of prejudice, we conclude that defendant's ineffective assistance of counsel claim is without merit.[2]

### III. THE CONFRONTATION CLAUSE

Defendant next argues that the trial court erred when it granted the prosecution's motion to introduce the hearsay statements of SC and EH because the statements were testimonial in nature and therefore violated defendant's right to confrontation. We disagree.

A defendant has the right to be confronted with the witnesses against him during criminal prosecutions. US Const, Am VI; Const 1963, Art 1, § 20; *Crawford v Washington*, 541 US 36, 42; 124 S Ct 1354; 158 L Ed 2d 177 (2004). Whether a defendant was denied his Sixth Amendment right to confrontation is a question of constitutional law that this Court reviews de novo. *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). The Confrontation Clause generally prohibits the admission of out-of-court testimonial statements unless the declarant was unavailable at trial and the defendant had a prior opportunity to cross-examine the declarant. *Id.* at 68. In *Crawford*, The United States Supreme Court described testimonial statements generally:

> Various formulations of this core class of "testimonial" statements exist: "ex parte in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially," . . . "extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions," . . . "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial" . . . . These formulations all share a common nucleus and then define the Clause's coverage at various levels of abstraction around it. Regardless of the precise articulation, some statements qualify under any definition—for example, ex parte testimony at a preliminary hearing.

---

[2] We note that defendant makes brief statements regarding his counsel's failure to request an adjournment after receiving an unfavorable report from Dr. Matshes, and his counsel's failure to file a witness list. Defendant does not flesh these issues out, and accordingly, we decline to address them. See *People v Kelly*, 231 Mich App 627, 641; 588 NW2d 480 (1998) ("An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims, nor may he give only cursory treatment with little or no citation of supporting authority.").

Statements taken by police officers in the course of interrogations are also testimonial under even a narrow standard. [*Id*. at 51-52 (citations omitted).]

In 2006, the Supreme Court further explained the distinction between testimonial and nontestimonial statements:

Statements are nontestimonial when made . . . under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution. [*Davis v Washington*, 547 US 813, 822; 126 S Ct 2266; 165 L Ed 2d 224 (2006).]

Later, in *Michigan v Bryant*, 562 US 344, 131 S Ct 1143, 179 L Ed 2d 93 (2011), the Supreme Court "further expounded" on what had come to be known as the "primary purpose test." *Ohio v Clark*, ___ US ___, ___; 135 S Ct 2175, 2180; 192 L Ed 2d 306 (2015). The *Bryant* Court "noted that 'there may be *other* circumstances, aside from ongoing emergencies, when a statement is not procured with a primary purpose of creating an out-of-court substitute for trial testimony.' " *Id*., quoting *Bryant*, 562 US at 358. "[W]hether an ongoing emergency exists is simply one factor—albeit an important factor—that informs the ultimate inquiry regarding the 'primary purpose' of an interrogation." *Bryant*, 562 US at 366. The central question for determining whether a statement is testimonial with respect to the Confrontation Clause is whether, "in light of *all* the circumstances, viewed objectively, the 'primary purpose' of the communication was to create an out-of-court substitute for trial testimony." *Id*. at ___; 135 S Ct at 2180 (emphasis added).

One additional factor is 'the informality of the situation,' " as a "formal station-house-interrogation . . . is more likely to provoke testimonial statements, while less formal questioning is less likely to reflect a primary purpose aimed at obtaining testimonial evidence against the accused." *Id*. Another factor is the identity of the hearsay witness: statements made to "individuals who are not law enforcement officers . . . are much less likely to be testimonial than statements to law enforcement officers." *Id*. at ___; 135 S Ct at 2181. Finally, the Supreme Court recently noted that the age of the declarant may also be a factor. *Id*. at ___; 135 S Ct at 2181-2182. In *Clark*, a three-year-old child made statements to his preschool teacher about abuse, and those statements were admissible against his abuser because the child did not make the statements with the primary purpose of creating evidence for the abuser's prosecution. *Id*. at ___; 135 S Ct at 2182. Although the Court noted that the declarant in *Clark* had made the statements to his teacher rather than law enforcement officers, the Court also noted that young children will rarely "understand the details of our criminal justice system," and thus it is "extremely unlikely" that they would ever "intend [their] statements to be a substitute for trial testimony." *Id*. Michigan caselaw has yet to specifically address that idea.

In 2004, this Court recognized in dicta that a two-year-old child's statement that she had an "owie" was not testimonial in nature. *People v Geno*, 261 Mich App 624, 631; 683 NW2d 687 (2004). Rather than consider the child's young age, however, this Court reasoned that "[t]he child's statement was made to the executive director of the Children's Assessment Center, not to

-5-

a government employee," and the statement was not "in the nature of *ex parte* in-court testimony or its functional equivalent[.]" *Id.*, quoting *Crawford*, 541 US at 51 (quotation marks omitted). In 2009, this Court held that, in order to determine whether statements made by a four-year-old victim to a SANE were testimonial in nature, "the reviewing Court must consider the totality of the circumstances of the victim's statements and decide whether the circumstances objectively indicated that the statements would be available for use in a later prosecution or that the primary purpose of the SANE's questioning was to establish past events potentially relevant to a later prosecution rather than to meet an ongoing emergency." *People v Spangler*, 285 Mich App 136, 154; 774 NW2d 702 (2009). We now conclude, given the direction of the law since *Clark*, and given the totality of the circumstances under which SC and EH made their statements, the statements were not testimonial in nature and were properly admitted at trial.

Defendant contends that the statements from SC and EH are testimonial in nature because they were taken after the investigation into defendant was underway. Although it is true that EH and SC were both interviewed after BH's death and after the investigation concerning that death had begun, the children were not interviewed to obtain information about BH's death or defendant's involvement in that death. Both children were interviewed by CPS workers—not law enforcement—for the purpose of assessing their own safety in light of the deaths of BH and JP. It is also notable that both children were approximately three years old at the time of their statements, and it is thus highly unlikely that they could have intended their statements to be a substitute for trial testimony. Under the circumstances, despite the formality of the interviews, where CPS interviewed the children to ensure their safety and not to aid a police investigation, and where the children were too young to understand the legal implications of their statements, the statements were not testimonial.

We note that post-*Clark* cases from multiple other states support our conclusion, and further endorse the principle that very young children are unlikely to implicate the Confrontation Clause. See *State v Webb*, 569 SW3d 530, 534, 544 (Mo App, 2018) (a three-year-old victim's statements to his teachers were admissible where the teachers were acting "out of concern for [the v]ictim's well-being and not for purposes of assisting in [the defendant's] prosecution," *and* because the age of the child tended to preclude him from having any "prosecutorial purpose in mind when expressing his thoughts"); *Schmidt v State*, 401 P3d 868, 872, 885; 2017 WY 101 (2017) (statements of a mildly cognitively impaired six-year-old to her school nurse were admissible because they were spontaneous, made in an informal setting, and there was "no indication that [the child] made her statements intending them to be used in a prosecution or even knew such a result was possible"); *State v Streepy*, 199 Wash App 487, 494-496; 400 P3d 339 (2017) (statements to a police officer were not testimonial, in part, because there was "little difference" between the "terrorized seven-year-old" declarant and "the preschooler discussed in *Clark*"); *State v Daise*, 421 SC 442, 455-456; 807 SE2d 710 (App, 2017) (two-year-old's statements in response to questioning by police were nontestimonial because the police were inquiring as to the declarant's injuries during an ongoing medical emergency, and because of the declarant's "very young age"); *State v Diaz*, 2016-Ohio-5523, ¶¶ 40-47; 69 NE3d 1182 (Ohio App, 2016) (three-year-old child's statements to a nurse and to a social worker were admissible because the statements were made for the purpose of medical diagnosis and treatment, and because, pursuant to *Clark*, statements by young children very rarely implicate the Confrontation Clause).

Similarly, several federal circuits have applied *Clark's* reasoning and would likely reach the same outcome in this case. In *United States v Barker*, 820 F3d 167, 169, 171 (CA 5, 2016), the United States Court of Appeals for the Fifth Circuit held that statements made by a four-and-a-half-year-old child to a SANE were not testimonial in nature because the primary purpose of the SANE interview was to medically evaluate the child, and because the child "lacked the understanding of the criminal justice system to intend her comments to function as a substitute for trial testimony." The court noted that this would tend to be true of preschool-aged children who "generally lack an understanding of our criminal justice system, let alone the nuances of a prosecution." *Id.*, citing *Clark*, ___ US at ___; 135 S Ct at 2182. Similarly, in *United States v Clifford*, 791 F3d 884, 888 (CA 8, 2015), the Eighth Circuit determined that statements made by a three-year-old child to a private citizen were not testimonial. First, the court noted that, although *Clark* declined to adopt a categorical rule that statements made to private citizens were nontestimonial, those statements are nonetheless " 'much less likely to be testimonial than statements to law enforcement officers.' " *Id.*, quoting *Clark*, ___ US at ___; 135 S Ct at 2181. Second, the court noted that the child's "age [was] *significant* since '[s]tatements by very young children will rarely, if ever, implicate the Confrontation Clause' because 'it is extremely unlikely that a three-year-old child . . . would intend his statements to be a substitute for trial testimony.' " *Id.* (emphasis added; second alteration in original), quoting *Clark*, ___ US at ___; 135 S Ct at 2182.

We found only one post-*Clark* case that concludes that the statements of a young child made to a private citizen outside of an interrogation were testimonial such that they implicated the Confrontation Clause. In *McCarley v Kelly*, 801 F3d 652, 655-659 (CA 6, 2016), a three-and-a-half-year-old child made statements to a child psychologist incriminating the defendant in the murder of the child's mother. The court acknowledged that *Clark* addressed "whether a three-year-old's statements were testimonial," but concluded that *Clark* involved "vastly different circumstances." *Id.* at 662 n 1, citing *Clark*, ___ US at ___; 135 S Ct at 2181.[3] Unlike *Clark*, there was no ongoing emergency when the *Kelly* declarant finally spoke with the child psychologist, and perhaps most importantly, testimony from trial indicated that the *sole purpose* of the minor child's session with the child psychologist was to "see if the[ psychologist] could extract any information from him that he remembered from th[e] evening" of his mother's murder. *Id.* at 664-665. Testimony "unambiguously" established that the main reason the minor child was interviewed by the child psychologist was for the police to obtain information relevant to their investigation. *Id.* at 665. Thus, even though the psychologist was not "a member of the police department," she was acting as an agent of law enforcement "such that her acts could likewise be considered 'acts of the police.' " *Id.* at 664, quoting *Davis*, 547 US at 823 n 2.

---

[3] Importantly, *Kelly* was an appeal from a denial of a petition for a writ of habeas corpus pursuant to 28 USC 2254. In such cases, where issues have already been decided on the merits by a state court, 28 USC 2254(d)(1) instructs federal courts to deny applications for writs of habeas corpus unless the issues decided on the merits were contrary to "clearly established Federal law." Because *Clark* had not been decided when the Ohio Court of Appeals admitted the minor child's statements in *Kelly*, the *Kelly* court explicitly noted that *Clark* did not apply to its analysis. *Kelly*, 801 F3d at 662 n 1.

In this case, SC's statement was given to a CPS employee when SC was approximately three years old, and was being interviewed to determine if his father's home was fit for children. When SC was asked if he knew defendant, SC replied, "yeah, him [sic] choked me." SC then frantically repeated the accusation a number of times while pointing to his neck. Similarly, EH's statement was given to a CPS employee during a forensic interview when she was three years old. The interviewer asked EH if she knew defendant, and she replied that she did. The interviewer then asked if there was "something that [defendant] does that [EH does not] like, does that sound right?" EH replied that defendant choked her. The interviewer asked if there was anything else defendant did that EH did not like, to which she replied that he "choked her siblings as well." With respect to EH, the CPS worker addressed a number of issues before ever asking if EH knew defendant, and it seems clear that the goal was to evaluate the ongoing emergency of abuse in the home and to protect EH. The same is true for SC: a CPS worker was interviewing SC to determine if his father's home was a safe environment for a child. The interviewers were never directly investigating defendant's involvement in BH's or JP's deaths, or attempting to extract testimony from the children.

The trial court correctly recognized that the hearsay statements derived from the forensic interview were nontestimonial in nature. The court examined the totality of the circumstances concerning each statement and noted that each statement was spontaneous, consistent, age appropriate, and given under circumstances indicating trustworthiness. The trial court permitted the statements only after concluding that they were given—not for testimonial purposes—but to address ongoing emergencies in the children's homes. See *Spangler*, 285 Mich App at 154. We agree with the trial court that the statements were not testimonial, and that their admission at trial did not violate defendant's right to confrontation.

## IV. DISCLOSURE UNDER MCL 768.27c(3)

As an aside, we note that defendant's brief on appeal vaguely suggests that the prosecution did not provide adequate notice of SC's and EH's statements under MCL 768.27c(3). Although it is not the duty of this Court to discover and rationalize the basis for defendant's claims, *People v Kelly*, 231 Mich App 627, 641; 588 NW2d 480 (1998), we elect to briefly address this issue because, as it happens, the suggestion has merit. The hearsay statements at issue were admitted under MCL 768.27c(1), which provides:

> (1) Evidence of a statement by a declarant is admissible if all of the following apply:

> (a) The statement purports to narrate, describe, or explain the infliction or threat of physical injury upon the declarant.

> (b) The action in which the evidence is offered under this section is an offense involving domestic violence.

> (c) The statement was made at or near the time of the infliction or threat of physical injury. Evidence of a statement made more than 5 years before the filing of the current action or proceeding is inadmissible under this section.

(d) The statement was made under circumstances that would indicate the statement's trustworthiness.

(e) The statement was made to a law enforcement officer.

Subsection (3) of the statute then provides that prosecutors seeking to admit evidence under the statute must disclose the evidence to the defendant "not less than 15 days before the scheduled date of trial or at a later time as allowed by the court for good cause shown." MCL 768.27c(3).

At trial, defendant's counsel objected to the admission of the hearsay statements as follows:

Under 768.27, be it a, b[,] or c, th[ey] had to have been [sic] given notice to us at least 15 days in advance. The prosecution certainly gave notice under the hearsay exceptions, including the catch-all, but at no time was a written notice under the domestic violence statute ever given.

One might interpret the argument in one of two ways: (1) the prosecution failed to disclose the evidence within 15 days, or (2) the prosecution failed to file a written notice of their intent. The latter argument has no merit, as MCL 768.27c(3) does not require the prosecution give a written notice of its intent to offer evidence. Rather, and notably in contrast to some other hearsay exceptions that require the offering party make known to the adverse party their intent to offer the evidence, see, e.g., MRE 803(24); MRE 803A, the statute only requires that the prosecuting attorney *disclose* the evidence itself to the defendant at least 15 days in advance of trial.

It is apparent from our review of the record that the prosecution did not disclose SC's and EH's statements to defendant in a timely manner. The record reflects that the prosecution first served on defendant the report containing EH's hearsay statements on October 23, 2017, and first served on defendant the report containing SC's statements on October 26, 2017. Trial began on November 6, 2017, meaning EH's statements were disclosed 14 days before trial, and SC's statements were disclosed 11 days before trial. There is no indication from the lower court record that there was ever a discussion regarding whether the prosecution had good cause for their tardy disclosure, and accordingly, it would seem that admission of SC's and EH's hearsay statements violated MCL 768.27c(3).

Because this error is nonconstitutional, however, it is subject to the harmless-error rule. *People v Lukity*, 460 Mich 484, 491; 596 NW2d 607 (1999). Michigan applies the rule via statute:

No judgment or verdict shall be set aside or reversed or a new trial be granted by any court of this state in a criminal case, on the ground of . . . the improper admission or rejection of evidence, . . . unless in the opinion of the court, after an examination of the entire case, it shall affirmatively appear that the error complained of has resulted in a miscarriage of justice. [MCL 769.26.]

"In order to overcome the presumption that a preserved nonconstitutional error is harmless, a defendant must persuade the reviewing court that it is more probable than not that the error in question was outcome determinative." *People v Elton*, 462 Mich 751, 766; 614 NW2d 595

(2000), citing *Lukity*, 460 Mich at 495-496. An error is not outcome-determinative unless it undermines the reliability of the verdict. *People v Young*, 472 Mich 130, 142; 693 NW2d 801 (2005).

In this case, the evidence against defendant was overwhelming, and we are not convinced the admission of SC's and EH's statements was outcome-determinative. Testimony establishes that defendant was the only individual in the room when BH died, and the nine-day jury trial involved testimony from six medical experts and written reports from seven medical experts that, for the most part, tended to show that BH's death was a homicide caused by blunt trauma. Evidence also suggested that defendant had a history of engaging in abusive conduct with his girlfriends and their children. Moreover, even without the statements of SC and EH, other independent testimony from Dr. Kevin Durell and EH's mother indicated that *both* children at one point in time had petechial rashes on their face—a sign consistent with being choked. Finally, defendant even admitted in a police interview to picking up BH, shaking him, and "putting [BH] back down on the bed harder than [he] should have." There was no shortage of evidence against defendant in this case, and we cannot conclude that the failure to strictly comply with the disclosure provision of MCL 768.27c(3) was anything but harmless.

Affirmed.

/s/ Karen M. Fort Hood
/s/ Colleen A. O'Brien
/s/ Thomas C. Cameron